## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JAMIE DYER,

      Plaintiff,

                                      **Civil Action 2:17-cv-01005**
                                      **Judge Michael H. Watson**
      v.                               **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Jamie Dyer ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance benefits ("SSDI") and Supplemental Security Income benefits ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Corrected Statement of Errors (ECF No. 18), the Commissioner's Memorandum in Opposition (ECF No. 24), and the administrative record (ECF No. 8). Plaintiff did not file a Reply. For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff applied for disability benefits on February 6, 2014, asserting disability from anxiety, hypertension, COPD, sciatica, GERD, and psychosis. (R. at 237, 280.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 1.) Upon request, a hearing was held on

August 5, 2016, in which Plaintiff, represented by counsel, appeared and testified. (R. at 47–96.) A vocational expert also appeared and testified at the hearing. (*Id.*) On November 15, 2016, Administrative Law Judge Jeffrey Hartranft ("the ALJ") issued a decision finding that Plaintiff was not disabled at any time after January 1, 2014, the alleged onset date.[1] (R. at 38, 266.) On September 26, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II.  HEARING TESTIMONY

### A. Plaintiff's Testimony

At the August 2016 administrative hearing, Plaintiff testified that she had been married since 2011 but her husband passed away on July 18, 2016. (R. at 57.) However, Plaintiff stated that she and her husband had been separated since 2014. (R. at 57–58.) Plaintiff first testified that she did not have children, but then stated that "between us me and him have kids and then I have kids." (R. at 58.) She went on to testify that she has a twelve-month old, a twelve-year-old, a twenty-one-year-old, and a twenty-six-year-old. (*Id.*) Plaintiff testified that the younger ones live with her. (*Id.*) Plaintiff further testified that she has five grandchildren, with a six-year-old being the oldest and the youngest being five-months-old. (R. at 86.) Furthermore, Plaintiff testified that she lives in one half of a duplex and her twenty-one-year-old daughter lives in the other half. (R. at 58–59.) She stated that her twenty-one-year-old helps her "tremendously" with household chores, and so does her twelve-year-old. (R. at 78.) She further stated that child support is her only current source of income. (R. at 79.) Plaintiff testified that she has a driver's

---

[1] Plaintiff originally filed her applications for DIB and SSI alleging an onset date of December 2, 2011. (R. at 237.) However, upon the advice of her attorney, Plaintiff amended her alleged onset date to January 1, 2014. (R. at 266.)

license.  (R. at 59.)  The ALJ asked Plaintiff if she was still driving before her surgery, to which she testified: "Kind of, sort of. It's too much. A short distance."  (*Id.*)  She then testified that she was physically able to drive before her surgery though.  (*Id.*)

Plaintiff testified that she finished the tenth grade and has a GED.  (R. at 59.)  She stated that she left school before graduation because she had a child in ninth grade.  (R. at 60.)  She further stated that while in school she had been in regular classes and could read and write.  (*Id.*)  Plaintiff also testified that she currently weighed "135, 140 something."  (R. at 57.)  She further testified that the most she weighed after the alleged disability onset date was three-hundred and twenty pounds.  (*Id.*)  Plaintiff stated that her gastric bypass surgery did not help with her pain and that she has had complications including that she "[doesn't] eat" and "can't eat."  (R. at 70 & 77.)

The ALJ inquired about Plaintiff trying to get pain medication from two doctors.  (R. at 74.)  Plaintiff testified "one gave [her] injections because it wouldn't help [her] . . . before I had my surgery . . . [the doctor] wouldn't change [her] meds to liquid, because [she'd] seen the gastric bypass doctor. So [the doctor] didn't feel comfortable treating [her] after having the gastric bypass. They gave [her] liquid and [the doctor] wouldn't service [her]."  (R. at 74.)  She further testified that her doctor was upset she had the gastric bypass surgery and that he "dismissed" her for it.  (R. at 75.)  Additionally, Plaintiff stated that the gastric bypass surgery was an emergency because the doctor saw on an MRI that her "left leg, side nerves were sticking up."  (R. at 76.)  Plaintiff stated that she would be in physical and occupational therapy going forward.  (*Id.*)

Regarding her past work history, Plaintiff testified that her last job was at a friend's private cleaning business in 2013 where she "helped a lot of paperwork, do like data, and then

working in like a desk and stuff, to where I just couldn't sit no more. I was standing and she was wanting me to sit and I couldn't sit." (R. at 60–61.) She also testified that she would wipe "higher things" off such as desks. (*Id.*) Plaintiff stated that she thought she worked there for about six months. (R. at 61.) Plaintiff testified that before that job she "think[s] [she] worked at Family Dollar" where she was a cashier. (R. at 62, 64.) She also testified that she received some self-employment income from babysitting a little girl from the time she was nine months old until she was almost three years old. (R. at 62–63.) Plaintiff stated that at one time she also drove a forklift through a temp service for approximately two months. (R. at 64–65.)

Plaintiff testified that she had back surgery and physical therapy in 2013 but her back did not get better. (R. at 66.) She further testified that she was to have another surgery for her back in April 2013, but it could not be completed because of a virus she had. (R. at 66–67.) In May 2013 she was able to have the next back surgery but it "took [her] completely out" and "all [she] did was just sit around and hold [her] leg and [her] thigh and just lounge" afterwards because "it hurt too bad to move." (R. at 67.) She further testified that when her back hurt after the surgery that is when she stopped working in 2013. (*Id.*) The ALJ questioned as to why the report stated she had worked all the way through December 2013, and Plaintiff testified that "it wasn't every day work." (*Id.*) When the ALJ asked her how many days she was working, Plaintiff stated that "sometimes [she'd] only work once, sometimes [she'd] work two." (*Id.*) Plaintiff further stated that when she did work it was not for more than two or three hours. (R. at 68.)

In the beginning of 2014, Plaintiff testified that she had pain "down the right and the left legs" and that her "left leg was worse." (*Id.*) She further testified that both her legs would become numb and she would start to fall. (R. at 69.) Plaintiff testified that it was after this when an MRI was set up which showed that she had a broken disc. (*Id.*) Plaintiff testified that she has

"got[ten] worse" from 2014 through July 2015. (R. at 70.) Plaintiff stated that before her most recent surgery she estimated that the longest she could have stood or walked at one time was between ten or fifteen minutes, and then she would need about five or ten minutes of rest before she could stand or walk again. (*Id.*) Furthermore, Plaintiff testified that she would not sit comfortably during the rest time, and that she would "twist a lot." (*Id.*) The ALJ asked Plaintiff how long she could sit if she was able to shift around and twist, and Plaintiff stated "no, I really sit still." (R. at 71.) Plaintiff also testified regarding shots she had for her back, stating that the shots triggered her fibromyalgia. (R. at 73.)

Plaintiff testified that she has bad anxiety which has affected her for three years. (R. at 71.) Plaintiff further testified that she is on medication for her anxiety which "sometimes" helps, but "sometimes not." (R. at 71–72.) Plaintiff also testified that she sees a doctor two or three times a week. (R. at 72.) Plaintiff additionally stated that she takes medication called Sentara for attention deficient disorder. (R. at 84.) She stated that Dr. Paul gives her that medicine, and that he works with Dr. Kistler.[2] (R. at 84.) Plaintiff testified that she still has some symptoms despite the medication, but she guesses "it slows [her] down some." (R. at 85.)

Additionally, Plaintiff testified that she suffers from migraines about three times a month that last "sometimes twenty-four to forty-eight hours," which she takes medicine to control. (R. at 72.) She stated that the medicine helps "sometimes" and that she has gone to the emergency room because of her migraines. (*Id.*) She further stated that the last time she went to the hospital for a migraine was July 20, 2015, but then clarified that she had been staying at the hospital due to her surgery on July 19, 2015. (R. at 72–73.)

---

[2] The hearing testimony transcript incorrectly spells Dr. Kistler's name as "Kessler."

**B. Vocational Expert Testimony**

Carl Hartung testified as the vocational expert ("VE") at the August 2016 hearing.  (R. at 22, 87–95.)  The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 87–94.)  First, the ALJ asked the VE to assume someone who is capable of working at the light exertional level except that they "could occasionally climb ramps and stairs, could not climb ladders, ropes, or scaffolds."  (R. at 87–88.)  Furthermore, they "would be capable of frequent balancing, occasional stooping, frequent kneeling, crouching, and crawling."  (R. at 88.)  Additionally, they "would need to avoid workplace hazards, such as unprotected heights and machinery, and cannot perform commercial driving." (*Id.*)  They "would be capable of simple, routine, and repetitive tasks involving only simple work related decisions and few, if any, workplace changes." (*Id.*)  They "could work in positions that did not require strict production quotas or fast paced work such as . . . assembly line and [they] would be capable of working in positions . . . [requiring] only occasional interaction with the general public, coworkers, and supervisors, and with no tandem tasks." (*Id.*)  Given those restrictions, the VE said the person could perform one of Plaintiff's past jobs, that of office helper. (*Id.*)

Assuming the above hypothetical along with Plaintiff's educational and vocational background, the VE testified that considering central Ohio as the region, the hypothetical person could perform the jobs of housekeeping cleaner, marker, and laborer.  (R. at 88–89.)  The ALJ then asked the VE to assume that the hypothetical individual would be capable of standing and walking for four hours of the work day, but they could only work in positions that did not require interaction with the general public but could interact with coworkers and supervisors in the same way as the previous hypothetical.  (R. at 89.)  The VE testified that the hypothetical individual could not perform any of the Plaintiff's past work. (*Id.*)  The VE further testified that if

hypothetical individual had the Plaintiff's educational and vocational background they could work as an addresser, document preparer, and in an inspector position. (R. at 89–90.)

The ALJ then asked the VE to assume that the hypothetical individual is capable of working at the sedentary exertional level, except that they can occasionally climb ramps and stairs, cannot climb ladders, ropes, or scaffolds, and they would be capable of occasional balancing, stooping, kneeling, crouching, and crawling. (R. at 90–91.) The VE testified that the hypothetical individual could perform all the same work as in the previous hypothetical. (R. at 91.) The ALJ then adjusted the hypothetical so that the hypothetical person was capable of standing and walking for fifteen minutes at a time (two hours total over the course of a work day), sitting for one hour at a time (six hours total over the course of the work day), and after sitting for one hour they would need to stand or change position to standing or walking for two or three minutes. (*Id.*) The ALJ noted this could be combined with the usual breaks or other workplace tasks and "as a result the hypothetical individual would be off task five percent of the work day because of the need to change positions." (*Id.*) The VE testified that this individual could still perform all the same work as in the previous hypothetical. (*Id.*)

The VE further testified that if the person had to be off task ten percent of the day, that would eliminate the prior jobs he had identified. (R. at 92.) If the hypothetical individual was unable to sit for four hours out of the work day and stand or walk for four hours of the work day the VE testified that there would not be any work available for that person. (*Id.*)

## III.     MEDICAL RECORDS

### A.  Charles Kistler, M.D.

Dr. Charles Kistler is Plaintiff's family doctor. (R. at 526.) On February 24, 2014, Dr. Kistler saw Plaintiff and noted issues with depression, stomach problems, breathing problems,

difficulty sleeping, and thyroid trouble. (R. at 910.) On March 24, 2014, Dr. Kistler noted Plaintiff exhibited problems including breathing issues, stomach problems, thyroid trouble, difficulty sleeping, and depression. (R. at 909.) On April 23, 2014, Dr. Kistler saw Plaintiff and noted issues with her stomach, breathing problems, depression, difficulty sleeping, and thyroid trouble. (R. at 908.) On May 19, 2014, Dr. Kistler noted that Plaintiff indicated she was experiencing bilateral hip pain, back pain, and burning down the legs and behind the knees. (R. at 907.) On May 22, 2014, Plaintiff was seen by Dr. Kistler who noted that Plaintiff exhibited depression, thyroid trouble, headaches, stomach problems, and difficulty sleeping, among other issues. (R. at 906.)

On June 19, 2014, Dr. Kistler saw Plaintiff and noted she exhibited thyroid trouble, breathing problems, difficulty sleeping, and depression. (R. at 905.) Dr. Kistler also noted, though, that Plaintiff "has been doing fairly well." (*Id.*) At some point after the June 19, 2014 visit, Dr. Kistler signed a form for the Social Security Administration indicating that the first time he saw Plaintiff was July 20, 2009, and the last time he had seen Plaintiff was June 19, 2014. (R. at 904.) Dr. Kistler also check marked boxes on the form for "permanently disabled," "physically disabled," and "psychologically disabled." (*Id.*)

On June 26, 2014, Plaintiff underwent an MRI of the lumbar spine. (R. at 911.) The interpreting physician, Francis M. Castellano, M.D., sent the results to Dr. Kistler noting interval left hemilaminectomy at L5-S1 and resection of a large disc extrusion with resolved spinal canal stenosis, disc bulge at L5-S1 eccentric to the left resulting in mild to moderate left neural foraminal narrowing, and enhancement surrounding the left S1 nerve root within the left lateral recess at L5-S1 suggesting scar formation. (R. at 911–912.)

8

Plaintiff saw Dr. Kistler on January 16, 2015. (R. at 981.) Dr. Kistler noted issues with breathing, depression, thyroid trouble, and difficulty sleeping, among other problems. (*Id.*) Plaintiff next saw Dr. Kistler on February 13, 2015 where he noted Plaintiff exhibited morbid obesity, difficulty sleeping, breathing problems, thyroid trouble, and depression. (R. at 982.) Dr. Kistler also noted that Plaintiff was "doing well" with her current prescription. (*Id.*) On March 13, 2015, Dr. Kistler noted that Plaintiff exhibited thyroid trouble, depression, breathing problems, morbid obesity, and difficulty sleeping. (R. at 983.) At an April 10, 2015, office visit, it was noted that Plaintiff exhibited thyroid trouble, depression, breathing problems, morbid obesity, difficulty sleeping, and a dry cough. (R. at 984.) The same issues, except for the dry cough, were noted again at an office visit on May 15, 2015. (R. at 985.) Again, the same issues were noted for Plaintiff's visit on June 12, 2015. (R. at 986.)

On July 10, 2015, Dr. Kistler noted that Plaintiff had breathing problems, depression, thyroid problems, and morbid obesity. (R. at 987.) He also noted that Plaintiff was "doing okay" with her current prescription. (*Id.*) Plaintiff then saw Dr. Kistler on August 7, 2015, and he noted Plaintiff had difficulty sleeping, breathing problems, depression, and thyroid trouble. (R. at 988.) Dr. Kistler again noted that Plaintiff was "doing well" with her current prescription. (*Id.*) He also noted that Plaintiff "would like pain shot." (*Id.*) On September 4, 2015, Dr. Kistler saw Plaintiff and noted she had difficulty sleeping, depression, and thyroid problems. (R. at 989.) Dr. Kistler further noted that Plaintiff had gastric bypass and "is losing weight!" (*Id.*) On October 2, 2015, Dr. Kistler noted that Plaintiff had breathing problems, depression, difficulty sleeping, thyroid trouble, and that her back pain was worse. (R. at 990.) Dr. Kistler also noted, though, that Plaintiff was "doing ok" on her current prescription. (*Id.*)

On October 30, 2015, Dr. Kistler again noted that Plaintiff had depression, thyroid trouble, and breathing problems. (R. at 991.) He further noted that Plaintiff complained of "terrible back pain." (*Id.*) On December 21, 2015, Dr. Kistler saw Plaintiff and noted she exhibited depression, breathing problems, and thyroid trouble. (R. at 992.) Plaintiff then saw Dr. Kistler on January 22, 2016, and he noted she had thyroid trouble, depression, and breathing problems. (R. at 993.) On February 14, 2016, Dr. Kistler noted issues of depression, cough, and congestion. (R. at 994.) He further noted that Plaintiff complained of feeling light headed and complained of "not eating—tries but can't eat, only drinks pop and popsicles, not food." (*Id.*) On March 18, 2016, the notes from Plaintiff's office visit indicated back pain and sinus issues. (R. at 995.) On April 15, 2016, Dr. Kistler noted that Plaintiff had issues with breathing problems, depression, difficulty sleeping, morbid obesity, and thyroid trouble. (R. at 996.) Plaintiff indicated that her pain level was a five out of ten. (*Id.*) When seen on May 13, 2016, Plaintiff exhibited trouble sleeping, stomach problems, and depression, among other issues. (R. at 997.)

On July 22, 2016, Dr. Kistler filled out an assessment for "Medical Source Statement: Patient's Physical Capacity." (R. at 1087–88.) Dr. Kistler indicated that Plaintiff could occasionally carry five pounds, and no pounds frequently. (R. at 1087.) He further indicated that Plaintiff was limited to standing/walking a total of one hour in an eight-hour work day, and five minutes without interruption. (*Id.*) Dr. Kistler indicated that Plaintiff could sit a total of two hours in an eight-hour work day, and fifteen to twenty minutes without interruption. (*Id.*) Dr. Kistler noted that Plaintiff could rarely climb (but no ladders), stoop, and kneel. (*Id.*) Dr. Kistler also noted that Plaintiff could never balance, crouch, or crawl. (*Id.*) Additionally, Dr. Kistler indicated that Plaintiff could rarely reach and perform gross manipulation, occasionally perform

fine manipulation, and never push/pull. (R. at 1088.) Dr. Kistler further indicated that heights, moving machinery, and temperature extremes are environmental restrictions that affect Plaintiff, but not pulmonary irritants or noise. (*Id.*) Dr. Kistler marked that a cane, walker, brace, and wheelchair have been prescribed to Plaintiff. (*Id.*) Dr. Kistler indicated that Plaintiff "is permanently and totally disabled from a physical standpoint from all sustained remunerative employment." (*Id.*)

### B. Robert Whitehead, M.D.

On May 23, 2016, Plaintiff saw Dr. Robert Whitehead regarding her Social Security Disability examination, with her chief complaint being low back pain. (R. at 966.) Plaintiff's weight at the examination was 153 pounds. (R. at 967.) Plaintiff complained of a "dull achy pain that is constant, sometimes sharper, averaging 8/10." (R. at 966.) Furthermore, Plaintiff indicated that the "pain frequently radiates down the left leg, [but] rarely down the right leg" and that there is "associated numbness and tingling in the distal calf and foot region, mostly lateral, on a daily basis." (*Id.*) Plaintiff further indicated that her symptoms were worse with activities like household chores, or prolonged sitting or standing. (*Id.*) Dr. Whitehead noted that Plaintiff could lift eight pounds safely, sit for fifteen minutes, stand for fifteen minutes, and walk about ten to fifteen yards. (*Id.*) Additionally, Dr. Whitehead noted that Plaintiff does light cooking and cleaning, and is able to perform activities of daily living. (*Id.*) Regarding Plaintiff's lumbar spine, Dr. Whitehead noted that "[s]ensation is altered in the left lower extremity on the lateral calf, dorsal foot and lateral foot." (R. at 968.)

Dr. Whitehead completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" for Plaintiff. (R. at 973–78.) Dr. Whitehead indicated that Plaintiff could occasionally lift up to ten pounds, but never more. (R. at 973.) Dr. Whitehead found that

Plaintiff could sit for one hour without interruption, stand for forty-five minutes without interruption, and walk for five minutes without interruption. (R. at 974.) In an eight-hour work day, Dr. Whitehead found that Plaintiff could sit for four hours, stand for four hours, and walk thirty to forty-five minutes. (*Id.*) Dr. Whitehead noted that Plaintiff did not require the use of a cane to ambulate. (*Id.*)

Furthermore, Dr. Whitehead found that Plaintiff could occasionally reach in all directions, including overhead, could frequently perform handling and fingering, but could never push/pull. (R. at 975.) Dr. Whitehead also found that Plaintiff could never operate foot controls. (*Id.*) Additionally, Dr. Whitehead found that Plaintiff could occasionally climb stairs and ramps, but never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (R. at 976.)

## IV. ADMINISTRATIVE DECISION

On November 15, 2016, the ALJ issued his decision. (R. at 22–38.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2014, the alleged onset date. (R. at 24.)

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ made the following findings regarding some of the Plaintiff's conditions:

The [Plaintiff] did receive some treatment for hypertension, which she was not taking as prescribed. . . . In 2016, her hypertension was under control with Lasix.

The [Plaintiff] received treatment for migraines. . . . [I]n October 2013, the [Plaintiff] was administered medication in the emergency room, which resolved her pain. Thereafter, the [Plaintiff] was taking medication, which did control her headaches. There was no probative evidence that she had three migraines per week, lasting more [than] one to two days, as she asserted at the hearing.

The [Plaintiff] was diagnosed with chronic obstructive pulmonary disease, and was prescribed medication for this condition. She had a chest x-ray that showed normal chest wall and normal hila. She had clear lungs without mass, interstitial disease or consolidation. She had no pleural effusion and no pneumothorax. In 2014, the [Plaintiff's] breathing was stable. Her lungs were clear to auscultation. She also had hypothyroidism that was stable. In January 2015, the [Plaintiff] received treatment for dyspnea and chest pain. However, on examination, she had normal respiration and non-labored respirations. She had normal breath sounds with good air movement. In July 2016, the claimant had no exacerbation of her breathing condition, before or after having spinal fusion.

In 2016, the [Plaintiff] did not assert that her breathing or hypothyroid condition limited her ability to work. On examination, she had clear lungs to auscultation. The [Plaintiff] was using medication for her breathing, which did improve with medication.

She also had hypothyroidism that was stable without significant treatment. . . . [T]here was no probative evidence that the [Plaintiff's] condition limited her ability to perform activity. . . . She was taking medication, which did control her hypothyroid condition.

The [Plaintiff] testified she was prescribed Strattera for Attention Deficit Hyperactivity Disorder. However, there was no objective evidence that the [Plaintiff's] symptoms limited her ability to perform activities during the day.

(R. at 25.) In all, the ALJ found that the above-listed conditions "did not have more than a minimal effect on [Plaintiff's] ability to perform work related activity, when considered singly or in combination with the claimants' other impairments." (*Id.*) Accordingly, the ALJ found that all the aforementioned conditions were "non-severe impairments." (*Id.*)

The ALJ did find that Plaintiff has the following severe impairments: obesity, lumbar disc disease with multiple surgeries, including fusion, diabetes mellitus, generalized anxiety disease, agoraphobia, and major depressive disorder with psychotic features.  (*Id.*)  He further found, though, that that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 26.)

The ALJ made the following specific findings regarding Plaintiff's severe impairments:

[For Obesity]: The [Plaintiff's] body mass index (BMI) falls in the category of Level I obesity under the clinical guidelines of the National Institutes of Health. However, based on the lack of medical evidence or related testimony, the [Plaintiff] failed to meet the listing requirements. . . . She lost significant weight, post-gastric bypass surgery, and her weight in June 2016 was 166 pounds. The [Plaintiff] did not have a significant cardiovascular impairment.

[For Lumbar Disc Disease]: . . . [T]he evidence does not show an inability to ambulate effectively for 12 months or more, as required. . . . Further, there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss or positive straight-leg raising test (sitting and supine, as required . . . . The record showed that the [Plaintiff] had 5/5 muscle strength in her lower extremities. She did not use an assistive device for ambulation. After the spinal fusion, she had 5/5 muscle strength and tone in all four extremities.

[For Diabetes Mellitus]: The treatment record showed that she had diabetes mellitus. However, this condition remained under control after she lost weight, and controlled her diet. The [Plaintiff] did not have substantial symptoms related to this condition.

[For Generalized Anxiety Disease, Agoraphobia, and Major Depressive Disorder with Psychotic Features]: The [Plaintiff] indicated that she had depression and anxiety. However, she indicated that she would dress without assistance. She indicated that she was limited due to pain. However, she did care for her children. She would attend appointments. She would grocery shop. In addition, she would watch movies. . . . she resided with her two children . . . [and] admitted that she would attend some school functions for her older child, which included her music concert. In addition, she admitted that she was able to drive. In social functioning, the [Plaintiff] has moderate difficulties. In 2014, the [Plaintiff] indicated that she would avoid others. However, she did interact with her children. She attended

appointments, three times per week. She indicated that she would grocery shop. In addition, the objective evidence showed that the [Plaintiff] had a fiancé, which strongly suggested that she was not socially isolated. Moreover, the record showed that [she] went out with family and friends. . . . The [Plaintiff] indicated she had legal custody and caring for her stepsisters' [sic] "severely challenged daughter" which contradicted the assertion that she had difficulty focusing on tasks. . . . [T]he [Plaintiff] has experienced no episodes of decompensation, which have been of extended duration.

(R. at 26.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

[Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can stand/walk for fifteen minutes at a time, two hours over the course of the workday. She can sit for one hour at a time, six hours over the course of the workday. After sitting for an hour, then stand/walk for two to three minutes. This could be combined with the usual breaks or other workplace tasks and as a result, she would be off task five percent as a consequence of this need to change position. The [Plaintiff] could occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She should avoid workplace hazards, such as unprotected heights, and machinery. She cannot perform commercial driving. She can perform simple, routine, repetitive tasks involving only simple work-related decisions and with few if any workplace changes. She cannot have strict production quotas or fast-paced work, such as an assembly line. She cannot interact with the general-public. She can have occasional interaction with coworkers and supervisors not involving tandem tasks.

(R. at 28.)

The ALJ gave "little weight" to the opinion of Dr. Robert Whitehead. (R. at 31.) The ALJ noted that in May 2016, Plaintiff attended a consultative physical assessment performed by Dr. Whitehead. (*Id.*) The ALJ gave "little weight" to Dr. Whitehead's opinion because "it was not consistent with the examination findings." (*Id.*) Additionally, the ALJ found that a subsequent examination of the Plaintiff performed by an orthopedic specialist did not support the limitations that Dr. Whitehead described. (*Id.*)

The ALJ also gave "little weight" to the opinion of Plaintiff's primary care physician, Dr. Charles Kistler. (R. at 32.) Dr. Kistler opined on Plaintiff's limitations in July 2016, before

Plaintiff's spinal surgery on July 19, 2016.  (*Id.*)  The ALJ gave "little weight" to Dr. Kistler's assessment because "it was not consistent with the record."  (*Id.*)  The ALJ noted that prior to the assessment, Plaintiff was caring for her two children, as well as her stepsister's daughter who was "severely challenged."  (*Id.*)  The ALJ found that these types of activities were inconsistent with the types of daily limitations described by Dr. Kistler.  (*Id.*)  Additionally, the ALJ found that the record showed that Plaintiff's physical functioning improved after the back surgery. (*Id.*)

The ALJ concluded that Plaintiff cannot perform her past relevant work as a child monitor, cashier II, forklift operator, or office helper.  (R. at 36.)  Relying on the VE's testimony, the ALJ concluded that the demands of Plaintiff's past relevant work exceed her RFC.  (*Id.*)  The ALJ found, though, that considering the Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.  (R. at 37.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act from January 1, 2014, through the date of the administrative decision.  (*Id.*)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley

v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.     ANALYSIS

Plaintiff puts forward two assignments of error. Plaintiff contends that the ALJ erred in

weighing the opinions of Dr. Charles Kistler, M.D., one of her treating physicians. (ECF No. 18,

at p. 14.) Plaintiff also contends that the ALJ erred in weighing the opinions of Dr. Robert

Whitehead, M.D., a consulting physician. (*Id.* at p. 19.) .) The Undersigned addresses these

arguments in turn.

In evaluating a claimant's case, the ALJ must consider all medical opinions that he or she

receives. 20 C.F.R. § 416.927(c). Medical opinions include any "statements from physicians

and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

### A. Opinions of Dr. Charles Kistler, M.D.

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550

(6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the

good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless some
> reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d
> Cir. 1999). The requirement also ensures that the ALJ applies the treating physician
> rule and permits meaningful review of the ALJ's application of the rule. *See
> Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45. Thus, the reason-giving requirement is "particularly

important when the treating physician has diagnosed the claimant as disabled." *Germany-

Johnson v. Comm'r of Soc. Sec*., 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d

at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson*

factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222

(6th Cir. 2010) (indicating that, under *Blakely* and the good reason rule, an ALJ is not required to

explicitly address all six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion

evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In his opinion, the ALJ listed *Wilson* factors that influenced his decision not to give Dr.

Kistler's opinions controlling weight. The ALJ points out that prior to Dr. Kistler's assessment,

Plaintiff was caring for two minor children and her stepsister's daughter who is "severely

challenged." (R. at 32.) The ALJ reasonably concluded that these types of activities are inconsistent with the limitations that Dr. Kistler assigned to Plaintiff. *See Minerd v. Berryhill*, No. 3:16-cv-00436, 2018 WL 1516781, at *4 (S.D. Ohio, Mar. 28, 2018) (holding ALJ properly considered plaintiff's activities of daily living as required under the social security regulations) (citing 20 C.F.R. § 416.929(a)); *see also* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (in evaluating extent to which symptoms, such as pain, limit claimant's ability to work, ALJ properly considers claimant's daily activities of living); *see also* 20 C.F.R. § 416.929(c)(4) (explaining that an ALJ will compare a plaintiff's reported symptoms with the objective medical evidence and *other evidence* for inconsistencies in evaluating a plaintiff's ability to work).

The ALJ also reasonably concluded that "the record showed that the [Plaintiff's] physical functioning improved after having her back surgery." (R. at 32.) Plaintiff disputes this finding somewhat, noting that it is "true to a limited extent" but claiming "it is equally true that there was no evidence that the physical functioning remained stable." (ECF No. 18, at p. 16.) Essentially, Plaintiff argues that the record regarding her back ended with her discharge from the hospital, and given that the hearing was only a couple weeks later, it is indeterminable whether Plaintiff improved after the back surgery. (*Id.*) Yet, in Plaintiff's discharge summary after the back surgery, Plaintiff denied leg pain, exhibited normal strength in her lower extremities, and was advised to increase her daily activity level. (R. at 32–33, 1127, 1130.) Furthermore, Plaintiff had the opportunity to submit additional evidence after the August 2016 hearing, but failed to provide any materials indicating that her condition was not stable after the July 2016 surgery. Regardless, the burden of proof and production falls on the Plaintiff to prove she is disabled. Her attempts to shift that burden by arguing "it is equally true that there was no evidence that the physical functioning remained stable[,]" fall short. 20 C.F.R. §§ 404.1512(a),

416.912(a) (explaining that in general the burden of proof regarding disability rests on the plaintiff).

The Undersigned finds, therefore, that the ALJ properly applied the *Wilson* factors with respect to Dr. Kistler's opinions and that substantial evidence supports the ALJ's conclusion.

### B. Opinions of Dr. Robert Whitehead, M.D.

Unlike Dr. Kistler, Dr. Whitehead is not a "treating physician" entitled to the deference outlined above. Rather, Dr. Whitehead was a consultative examiner, as he examined Plaintiff only once at the behest of the State Disability Determination Service. (R. at 966–68.) *See Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 467 (6th Cir. 2017) (one-time meeting with a psychological consultative examiner does not "create the on-going treatment relationship necessary to apply the treating source rule" and the ALJ is entitled to give less weight to the consultative examiner's opinion); *see also Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 245 (6th Cir. 2018) (holding that plaintiff was mistaken in suggesting that the ALJ was required to give controlling weight to the opinion of a consultative examiner who only examined plaintiff one time).

Importantly, "[a]lthough the opinions of a consultative examiner must be considered . . . the Social Security Act's requirement that ALJ's give 'good reasons' for assigning a particular degree of weight to a medical opinion applies only to the opinions of treating sources." *Jaggers v. Colvin*, No. 3:12-cv-746, 2014 WL 1364798, at *3 (W.D. Ky., Apr. 7, 2014) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) and 20 C.F.R. § 404.916(c)). Regardless, the ALJ in the instant matter sufficiently explain why he assigned "little weight" to Dr. Whitehead's opinion. The ALJ correctly points out that Dr. Whitehead's opinion "was not consistent with the examination findings[,]" as "[t]he evidence did not support limitations in

[Plaintiff's] upper extremities or lower extremities as Dr. Whitehead described." (R. at 31.) For instance, the restrictions opined by Dr. Whitehead do not comport with his own clinical findings which indicated that Plaintiff had normal upper strength, grasp, grip, manipulation, pinch, and fine coordination. (R. at 969.) Additionally, Dr. Whitehead found Plaintiff to have a normal range of motion in her upper and lower extremities. (R. at 970–72.) Dr. Whitehead also found that Plaintiff was "normal" in her ability to pick up a coin or key, write, hold a cup, open a jar, button/unbutton, use a zipper, or open a door. (R. at 970.) The ALJ properly discounted the consultative examiner's finding because it was inconsistent with his own examination report and the record as a whole. *See Bowman v. Comm'r of Soc. Sec.*, 638 F. App'x 367, 375 (6th Cir. 2017) (holding that ALJ properly discounts consultative examiner's opinion when it is inconsistent with examiner's own findings).

Additionally, the ALJ properly found that "the subsequent examination performed by the orthopedic specialist, of the [Plaintiff] did not support these limitations." (R. at 31.) Plaintiff argues that the ALJ's explanation is insufficient because he does not cite to the subsequent examination. (ECF No. 18, at p. 21.) The ALJ, though, is referring to Plaintiff's back surgeon, Dr. Buster, who performed back surgery on Plaintiff two months after Dr. Whitehead provided his assessment of Plaintiff's limitations regarding her extremities. (R. at 1107.) During the four-day hospital stay, hospital records indicated that Plaintiff was observed to either have "equal strength throughout" or "normal strength, sensation intact throughout." (R. at 1109, 1116.) Furthermore, in Plaintiff's discharge summary, she denied leg pain and could ambulate. (R. at 1127.) Dr. Whitehead's own clinical examination findings and Dr. Buster's subsequent findings undermine Dr. Whitehead's opinion regarding Plaintiff's extreme limitations. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of

doctors, particularly where they are unsupported by detailed objective criteria and documentation.") (citing *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citation omitted) (internal quotations omitted).

The Undersigned finds, therefore, that the ALJ properly supported his decision to assign "little weight" to the opinions of Dr. Whitehead regarding Plaintiff's limitations and that substantial evidence supports the ALJ's conclusion.

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: February 12, 2019                          _____/s/ *Elizabeth A. Preston Deavers*_____
                                                 ELIZABETH A. PRESTON DEAVERS
                                                 CHIEF UNITED STATES MAGISTRATE JUDGE